AO 91 (Rev. 11/11)  Criminal Complaint

**LODGED**
CLERK, U.S. DISTRICT COURT
5/30/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ MMC ___ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
5/30/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ bm ___ DEPUTY

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| BILLY RAYMOND DAVIS | ) | Case No.  2:25-MJ-03333-DUTY |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___May 29, 2025___ in the county of ___Los Angeles___ in the ___Central___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1): | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

/s/
*Complainant's signature*

Adam Chang, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  5/30/2025

*Judge's signature*

City and state:   Los Angeles, California

Hon. Jean P. Rosenbluth, U.S. Magistrate Judge
*Printed name and title*

*AUSA:* Max A. Shapiro x7419

## AFFIDAVIT

I, Adam Chang, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against Billy Raymond DAVIS ("DAVIS") for violations of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.   The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## II. BACKGROUND OF SPECIAL ADAM CHANG

3.   I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") and have been so employed since July 2024.  I am currently assigned to Los Angeles Field Division Enforcement Group 1.  I completed a formal 16-week DEA training program in Quantico, Virginia, where I received specialized training in the investigation of major narcotics trafficking organizations, violent crimes, conspiracy and narcotics importation and distribution.

4.    In the course of my duties with the DEA, I have been involved in investigations of (1) unlawful importation, exportation, manufacture, possession with intent to distribute, and distribution of narcotics, and (2) conspiracies associated with narcotic offenses.  My involvement in these investigations has included debriefing confidential sources, witnesses and defendants; conducting physical and electronic surveillance; executing search and arrest warrants; seizing narcotics and narcotics-related assets; making arrests for narcotics-related offenses; and analyzing documents and records related to drug-trafficking activities.

5.    Through my training, experience and discussions with criminal investigators and law enforcement personnel, I have become familiar with drug traffickers' methods of operation, including the manufacture, storage, transportation, and distribution of illegal drugs, the collection of money that represents the proceeds of drug trafficking, and money laundering techniques.  I am aware of sophisticated tactics that drug traffickers routinely use in attempts to thwart law enforcement investigations of their drug trafficking organizations, including the use of counter surveillance techniques, hidden vehicle compartments, elaborately planned smuggling schemes tied to legitimate businesses, and maintaining false or fictitious identities.

III. **SUMMARY OF PROBABLE CAUSE**

8.    The DEA has been working with a confidential source ("CS") to investigate a drug trafficking organization involving

2

DAVIS.  Based on the CS's statements and DEA Special Agents'
direct observations of a controlled purchase involving DAVIS,
law enforcement believes DAVIS is a supplier of methamphetamine
and possibly other drugs, who operates out of Los Angeles,
California.

9.    Through surveillance videos, direct observation, and
other methods, DEA monitored a March 19, 2025 drug transaction
where DAVIS sold approximately one pound of methamphetamine to
the CS from DAVIS's apartment in Los Angeles, California (the
"SUBJECT PREMISES").

10.  On May 29, 2025, DEA executed a search warrant at the
SUBJECT PREMISES and recovered multiple different types of
suspected controlled substances including methamphetamine and
cocaine, as well as nine loaded firearms.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

11.  Based on my review of law enforcement databases,
conversations with other law enforcement officers, my
involvement in this investigation, and my training and
experience, I am aware of the following:

### A. **DEA Investigates DAVIS's Drug Trafficking Organization**

12.  Since November 2024, DEA agents have been
investigating DAVIS, also known as "Rebel," as a methamphetamine
trafficker in the Los Angeles area.  Specifically, on November
25, 2024, DEA agents interviewed a Confidential Source ("CS")[1]

---

[1] The CS has several convictions, including for felon in
possession of a firearm, possession with intent to distribute
narcotics, sale of narcotics, personation with the intent to
*(footnote cont'd on next page)*

who stated that DAVIS is generally available at all hours of the day to engage in the sale of methamphetamine at the Piero Apartment located at 616 St. Paul Ave. Los Angeles CA 90017 (the "SUBJECT PREMISES") or at a 7-Eleven located on 848 W. 7th St. Los Angeles, CA 90017.  The CS further stated that anytime he/she has purchased methamphetamine from DAVIS, the transaction was facilitated through a broker, Tanya MERCER, aka Starry ("MERCER") who coordinated with DAVIS.  The CS stated that their past transactions with DAVIS involved purchasing approximately 1-pound of methamphetamine for $1,000 USD.

**B. On March 19, 2025, DEA Conducted a Controlled Purchase of Methamphetamine from DAVIS.**

13.  On March 19, 2025, at approximately 1:00 p.m., the CS, at the direction of law enforcement, placed a recorded telephone call to MERCER to facilitate the purchase of one pound of methamphetamine from DAVIS.  Moments after the call, MERCER contacted the CS to confirm the transaction would occur at the SUBJECT PREMISES.  Following the confirmation, the CS drove his personally owned vehicle to MERCER's apartment to pick her up and drove to the SUBJECT PREMISES, while being monitored by agents.  When they arrived at the SUBJECT PREMISES, MERCER exited the passenger door of the CS's vehicle and approached the side door, to the north-east part of the SUBJECT PREMISES.

---

make another person liable, and burglary.  Since his/her cooperation began, the CS has completed one controlled purchase with recorded calls in a federal investigation at the direction of law enforcement investigators inside the Central District of California.  The CS has also provided information that has been corroborated and proven to be truthful.  The CS is cooperating with law enforcement in hopes of receiving leniency with respect to pending charges.

Moments later, DAVIS partially opened the door and allowed MERCER to complete the drug transaction.

14.  Based on MERCER and DAVIS's toll records, the call logs indicate that on March 19, 2025, at approximately 1:00 p.m. MERCER placed an initial call to DAVIS to arrange the purchase. At approximately 1:37 p.m., MERCER made two calls to DAVIS then at 1:48 p.m., MERCER made a final call to DAVIS.  Based on my observation during the controlled purchase, the last three calls that MERCER made to DAVIS coincided with agents observing the CS and MERCER arrive at the SUBJECT PREMISES.

15.  Following the drug transaction, MERCER returned to the CS's vehicle while carrying a white plastic bag, and the CS drove MERCER back to her apartment, while monitored by law enforcement.  Afterwards, law enforcement followed the CS to a designated location where the CS subsequently transferred the white plastic bag over to law enforcement.

16.  Based on the results of a field test, the substance in the white plastic bag tested presumptively positive for methamphetamine.  Law enforcement then sent the substance to the DEA's Southwest Laboratory for testing.  Based on my review of the laboratory's chemical analysis report, I understand the laboratory concluded the substance contained approximately 425.9 grams of pure methamphetamine.



**C. DEA Agents Identify DAVIS's Identity and Residence.**

17.  On March 20, 2025, I served the property management company of the SUBJECT PREMISES, GHP Management, with an administrative subpoena for security camera footages from March 19, 2025.

18.  On April 9, 2025, I served GHP Management with a second administrative subpoena for any lease agreements, lease renewals, rental application, and payment ledgers for DAVIS and/or the individual listed as the leaseholder associated with DAVIS.  On April 10, 2025, GHP Management produced a lease agreement, lease renewal, rental application and payment ledger for 616 St. Paul Ave. APT 631, Los Angeles, CA 90017.  Upon

review, the rental documents revealed that the leaseholder was B Patrice Evans, with DAVIS listed as an emergency contact. I then spoke with a staff member at the leasing office of the SUBJECT PREMISES, who informed me that they believe DAVIS lives in the unit alone, without B Patrice Evans. Based on my training and experience, it is common for individuals engaged in drug trafficking activities to avoid using their true names on documents, leases, utility accounts and other records to conceal their identities and to evade detection by law enforcement.

19. After agents identified unit 631 as DAVIS's apartment unit, law enforcement installed a covert camera along the public hallway and positioned it to face the front door of DAVIS's unit to confirm his residency. The camera remained in place for one day.

20. On April 11, 2025, when agents retrieved the covert camera and reviewed its contents, the footage captured DAVIS entering and exiting apartment unit 631 at various times.

21. On April 16, 2025, GHP Management produced security camera footage of the north-east stairwell for March 19, 2025. At approximately 1 hour 52 minutes and 40 seconds into the footage, the footage shows a black male with dreads wearing a black button-down shirt, black hat and black pants carrying a white plastic bag on his right hand and walking up to the side door, opening it and handing the plastic bag to another individual, which based on my involvement in the investigation I understood to be MERCER. After the transaction, the camera

shows DAVIS walking towards the security camera then out of view.



   D. **Law Enforcement Executes Search Warrant at the SUBJECT PREMISES and Recover Various Controlled Substances and Firearms**

   22.  On May 22, 2025, the Honorable Stephanie S. Christensen, United States Magistrate Judge, issued a warrant authorizing law enforcement to search the SUBJECT PREMISES.  See 2:25-mj-03137.

   23.  On May 29, 2025 at approximately 4:30am, DEA investigators approached the SUBJECT PREMISES and began knocking

and announcing their presence.[2]  Shortly thereafter, law enforcement entered the SUBJECT PREMISES using a key I had received from the property manager the day before.  Upon entry, DAVIS jumped off his sixth-floor apartment balcony and landed onto the balcony of apartment unit 531 below.  DAVIS then entered unit 531.  When law enforcement interviewed the tenant of unit 531, A.S., he stated he was asleep in the living room when he suddenly woke up to find DAVIS standing on his balcony. DAVIS then entered A.S.'s apartment and walked out through the front door.  Based on my training and experience, I understood DAVIS to be evading law enforcement.

24.  At approximately 5:25am, DEA investigators located DAVIS hiding in a stairwell on level P-1 of the apartment complex and took him into custody.

25.  At approximately 5:45am, LAPD K-9 officer conducted a search of the SUBJECT PREMISES and alerted to the bedroom closet.

26.  At approximately 6:00am DEA investigators conducted a search of the SUBJECT PREMISES and recovered various suspected controlled substances.  Based on my training and experience, conversations with other investigators with experience investigating drug crimes, and the presumptive field testing results I reviewed, I understand law enforcement recovered the following suspected controlled substances:

---

[2] Based on my direct involvement in preparing the search warrant, I know that the warrant permitted night service.

a.   a black plastic bag containing a clear Ziplock bag with approximately 50 grams of suspected fentanyl in the form of green and blue pills and powder;

b.   a black plastic bag containing a clear Ziplock bag with multicolored pills of suspected 3,4-methylenedioxymethamphetamine ("MDMA");

c.   a clear tied baggie containing suspected methamphetamine in white crystalline form;

d.   four (4) clear plastic bags of off-white powder and rock-like substance and a scale with residue of suspected fentanyl;

e.   a gray plastic bag containing a clear tied bag of a brown rock-like substance of suspected fentanyl;

f.   a clear Ziplock bag containing four (4) small tied clear plastic bag containing suspected fentanyl;

g.   a clear Ziplock bag of multicolored pills and powder of suspected MDMA;

h.   a Ziplock bag containing a clear plastic bag with white powder substance of suspected fentanyl;

i.   a clear tied plastic baggie containing an off-white powder substance of suspected fentanyl;

j.   a clear Ziplock bag containing a white powdery substance of suspected cocaine;

k.   a tied clear plastic baggie of white powdery substance of suspected cocaine; a clear Ziplock bag containing a partially broken, off-white, brick-shaped substance of suspected fentanyl with "VERSA" imprinted;

l.    a black tray with two magnetic covers containing a white crystalline substance of suspected methamphetamine;

m.    two (2) ceramic containers containing a white crystalline substance of suspected methamphetamine.

27. Among the controlled substances seized, law enforcement field tested two samples which tested presumptively positive – one for cocaine, and the other for methamphetamine.[3]



---

[3] Following the search, law enforcement also conducted an in-field test of the suspected fentanyl and MDMA, but the results were inconclusive.  Based on my training and experience, I am aware that in-field tests of controlled substances can often yield inconclusive results because drug traffickers frequently mix the drugs they sell with other substances (i.e. a cutting agent).  Based on my training and experience, I am also aware that laboratory tests regularly reveal the existence of controlled substances, including fentanyl, following inconclusive in-field results.



     28.  Additionally, DEA investigators recovered nine (9) loaded firearms in DAVIS's bedroom near the suspected controlled substances.  DAVIS is a convicted felon and is prohibited from possessing firearms and/or ammunition.[4]

---

[4]   Based on my review of law enforcement records, I understand that DAVIS was convicted of felony armed robbery on November 28, 1979.



**E. DAVIS Admits to Selling Methamphetamine**

29.   At approximately 7:30am, I read DAVIS his Miranda
Rights.   Before I asked any questions, law enforcement
transported him to the Los Angeles Field Division Office.   While
there, another law enforcement officer and I conducted a
recorded consensual interview of DAVIS.   During the interview,
DAVIS admitted that the drug he sells the most is
methamphetamine.   DAVIS stated that he also has attempted to
sell fentanyl, but claimed his customers were not interested in
it.   Additionally, DAVIS admitted that he purchased most of the
firearms inside his apartment.

## V.  <u>CONCLUSION</u>

30.  For all of the reasons described above, there is probable cause to believe that Billy Raymond DAVIS has committed violations of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 30th day of May
2025.

_____
THE HONORABLE JEAN P. ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE

14